IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DONNA HENDERSON                :        CIVIL ACTION
                               :
                    v.         :
                               :
NUTRISYSTEM, INC.              :        NO. 08-592


MEMORANDUM

McLaughlin, J.                                        May 7, 2009

        This is a case based on an allegation of racial
discrimination and retaliation for the requested use of sick-time
benefits.  The plaintiff claims that she was fired by the
defendant on account of her race or, alternatively, because she
requested certain sick leave benefits.  The defendant argues that
the plaintiff was fired because of her violations of the
defendant's "no call/no show" policy.  The complaint includes
four counts: (1) a violation of Title VII on the basis of race
discrimination, (2) a violation of the Pennsylvania Human Rights
Act, (3) common law wrongful termination based on breach of an
implied contract and violation of public policy, and (4)
violations of the Family Medical Leave Act.  The defendant has
filed a motion for summary judgment seeking judgment in its favor
on each of these four counts.  For the reasons discussed below,
the Court will grant the defendant's motion as to each count.

I.   The Summary Judgment Record

        The plaintiff claims that her termination of employment
at NutriSystem was illegally motived by her race.  The defendant
has argued instead that the plaintiff's repeated absences from
work, along with her failure to inform her supervisors of those
absences, provided a legitimate basis for her termination.  The
plaintiff claims that the defendant's asserted basis for her
termination is pretextual.  She denies that she violated any
company policy and offers two other NutriSystem employees, both
Caucasians, as examples of employees belonging to a different
racial group who received more favorable treatment despite their
own absences.  This portion of the Court's opinion will recite
the facts contained in the summary judgment record.


        A.   The Plaintiff's Employment with the Defendant

        NutriSystem, Inc., is a marketer and provider of a
weight management program that employs counselors who are
available to answer questions and to make recommendations to
customers.  Def. Ex. C.  The counseling department at NutriSystem
is structured from bottom-up as follows: counselors, counseling
supervisors responsible for about 60 counselors, and senior
supervisors responsible for 3 or 4 counseling supervisors.  Def.
Ex. D at 12:5-16.  Counselors handle incoming phone calls, answer

emails and engage in online chatting with customers.  Id. at 29:7-11.

The plaintiff, Donna Henderson, is an African-American female who was hired in May of 2005 as a counselor for NutriSystem.  Pl. Ex. P-44.  The plaintiff had two direct supervisors during her tenure at NutriSystem.  The first was Laura Bansemer (née Van Zelst), the second was Jessica Saile.  Ms. Saile became the plaintiff's direct supervisor on November 13, 2006, and remained her direct supervisor until the end of the plaintiff's employment.  Pl. Ex. P-44.  The plaintiff has stated that Jessica Saile was her direct supervisor and that Laura was Saile's supervisor. Pl. Ex. F at 83:16-22.

NutriSystem provided the plaintiff with two employee handbooks during her tenure.  Def. Exs K, M.  Although the plaintiff was uncertain as to whether she received the second of these handbooks, she signed a document acknowledging receipt of that handbook.  Def. Ex. N.  The first handbook provides that

> an employee who will be absent must contact his/her supervisor prior to their scheduled starting time and give the reason for the unscheduled absence and the expected date of return.  Failure to follow this procedure may result in disciplinary action, up to and including termination.

Def. Ex. K at NS150.  The second handbook states that it is the employee's "responsibility to know the phone number of your immediate manager" and that "it is essential to notify your manager" when sick or late for work.  Def. Ex. M at 48.

3

The defendant had an 800-number call out line, to which employees could place calls and leave a message providing their name and reason for absence.  Def. Ex. R, 18-19.  The plaintiff disputes the defendant's claim that the company's policy was for absent employees to call both the 800-number and their direct supervisor.  Pl. Ex. F at 88.

The plaintiff's employee records state that she had one disciplinary warning regarding absences and tardiness prior to January of 2007.  On November 15, 2006, the plaintiff was presented with a written disciplinary warning that referenced several instances of tardiness, absenteeism and failure to clock-out for required thirty-minute breaks.  Def. Ex. T.  The plaintiff disputes the factual basis for one aspect of the warning (specifically, an incident on October 27, 2006, when the plaintiff allegedly failed to clock out for a mandatory 30 minute break) and contends that the warning should have been given verbally, rather than in writing, as it was her first disciplinary warning.  Pl. Ex. F at 109:2-110:5; Pl. Ex. G, ¶ 9.

B.   The Plaintiff's Absences and Termination in January of 2007

Both parties agree that the plaintiff was absent from work on certain days in January of 2007.  They also agree that she did not call into the office (either to a supervisor or to NutriSystem's 800-number) on certain of those days.  The record

4

contains the following evidence relating to the plaintiff's absences:

1.  On January 7, 2007, the plaintiff states that she called Laura Bansemer, but does not provide a phone record of that call.  Pl. Ex. F at 123.

2.  Someone placed a call to NutriSystem from the cell phone that the plaintiff was using in January of 2007 at 12:19 a.m. on January 8.  Pl. Ex. P-33.

3.  According to the defendant's call log, the plaintiff's sister called on January 8, 2007, at 4:30 p.m. when the plaintiff's shift began at 2:00 p.m.  Pl. Ex. 6.  The plaintiff stated at her deposition that her sister called NutriSystem on her behalf once or twice throughout January of 2007.  Pl. Ex. F at 198. Although the plaintiff at first claimed that her sister made these calls on the 8th of January, she then said "it could be afterwards, I'm not too sure."  Id. at 198:14-15.  The plaintiff's affidavit filed along with her opposition to the defendant's motion for summary judgment states that the plaintiff herself called NutriSystem on January 8, 2007.

4.     For both January 7 and 8, the plaintiff states that she
       was preapproved for her absences by her direct
       supervisor.  Pl. Ex. G, ¶ 10.  A document dated January
       5, 2007, and signed by Jessica Saile, does acknowledge
       that the plaintiff would be absent on January 7 and 8.
       Pl. Ex. P-26.

5.     The defendant claims that on January 14, 2007, the
       plaintiff arrived for work thirty minutes late.  An
       email from Jessica Saile, the plaintiff's direct
       supervisor, to the defendant's human resources
       department purports to memorialize this tardiness.
       Def. Ex. U.  The plaintiff does not refute this or
       state that she called in on this day.

6.     On January 17, 2007, a call from the plaintiff's phone
       was placed to the defendant's 800-number call-out line.
       The defendant states that no message was left on the
       answering service.  The plaintiff states that she left
       a message requesting a medical leave of absence.  Pl.
       Ex. F at 180.  During her deposition, the plaintiff
       could not remember the time of day she placed this
       call, although she supposed it was in the morning.  Pl.
       Ex. F at 181:15-17.  The plaintiff did not remember the

6

phone from which she placed that call.  Pl. Ex. F at
181:24.  She stated that she did not speak with her
supervisor that morning and that was the reason "[she]
was doing follow-up calls with [her supervisor]."  Pl.
Ex. F at 182:7.  The plaintiff also states in an
affidavit submitted along with her opposition to the
motion for summary judgment that her sister called
NurtiSystem on January 17.  Pl. Ex. G, ¶ 16.  As noted
above, the plaintiff's deposition states that her
sister called NutriSystem on her behalf once or twice.
Pl. Ex. F at 198.  Although the plaintiff at first
claimed that her sister made these calls on the 8th of
January, she then said "it could be afterwards, I'm not
too sure."  Pl. Ex. F 198:13-15.

7.    On January 18 and 19, 2007, the plaintiff was absent
      from work.  The defendant states that she did not call
      into NutriSystem on these days.  Def. Ex. U.  The
      plaintiff does not state specifically that she called
      on January 18, but does state that she called several
      times after January 17.  Pl. Ex. F at 181:2-4.

8.    On January 21, 2007, the plaintiff's cell phone records
      reflect that she made two calls to NutriSystem.  Pl.

7

Ex. P-33.  The defendant recognizes that two calls were made from the plaintiff's phone to the call out number, but states that she did not leave a message.  Def. Mot. at 11.

9.   The defendant acknowledges that the plaintiff called NutriSystem on January 22, 2007, but states that she did not leave a message concerning her absence.  Def. Ex. U.

10.  The defendant does not keep records of voice messages left by employees on its call-in line.  Oral Arg., April 15, 2009 at 49:11-17.

Throughout the plaintiff's absences, she suffered from a cold.  Def. Ex. F at 123:6-17, 142:13-18.  The plaintiff's medical records state that she visited her doctor's office on January 22, 2007.  Pl. Ex. P-58.  Her doctor's office recommended over-the-counter treatment with Robitussin and Tylenol P.M.  Id. On January 26, 2007, the plaintiff received a "disability certificate" from her doctor's office stating that the plaintiff had been "totally incapacitated."  Pl. Ex. P-22.

A series of emails between Jessica Saile and Heather Kelley (the senior supervisor of the counseling department),

8

Nancy Adams (the defendant's senior human resource generalist) and Laura Bansemer, captures certain communications regarding the plaintiff's termination.  Def. Exs U, X; Pl. Exs P-17-20.  These emails were initiated by Jessica Saile and report the plaintiff's absences first to the senior counseling supervisor, Heather Kelley, and then to human resources.  Jessica Saile asked how she should draft a corrective action notice.  Def. Ex. X.  Heather Kelley and Nancy Adams advised Saile on the proper means of drafting that notice.  Id.  Laura Bansemer did not contribute to the email chain provided by the parties although she was "carbon copied" on the original email from Jessica Saile.  Def. Ex. U.

A letter dated January 24, 2007, and signed by Nancy Adams, states that the defendant terminated the plaintiff "due to no call/no show 4 times in the month of January."  Def. Ex. Z.  The plaintiff points to statements from certain of the defendant's employees that cast doubt on the actual date of termination.  Pl. Ex. A at 88:15-18; Pl. Ex. P-28 (an Employee Action Notice listing the plaintiff's termination date as January 17, 2007).  The defendant maintains that the discrepancy is explained by the fact that January 17, 2007, was the day after the plaintiff's final working day at NutriSystem.  An Employee Action Notice listing January 15, 2007, as the plaintiff's final day at work was signed by Jessica Saile on January 24, 2007.  Pl. Ex. P-28.

9

On January 26, 2007, the plaintiff states that she
returned to NutriSystem with a note from her doctor's office, Pl.
Ex. P-25, but that a supervisor refused to review the note and
simply handed termination papers to her.  Pl. Ex. G, ¶ 14.


C.   <u>Facts relating to the Plaintiff's Proposed Comparators</u>

The plaintiff has named two former employees of
NutriSystem, both Caucasian, who allegedly received better
treatment from the defendant following patterns of behavior
similar to the plaintiff's own absenteeism.


1.   <u>Catherine Meyer</u>

The plaintiff's first comparator is Catherine Meyer.
Ms. Meyer is a Caucasian who began working for NurtiSystem in
January of 2004 as a weight loss counselor.  Ms. Meyer was
supervised by Ms. Bansemer and never by Ms. Saile.  Def. Ex. BB.

Ms. Meyer took two leaves of absence while working for
the defendant.  The first was from July 1, 2005, to August 22,
2005.  Ms. Meyer filled out an FMLA leave request covering these
dates on June 27, 2005.  Her second leave of absence was from
August 22, 2006, to October 13, 2006.  Ms. Meyer again filled out
FMLA leave request forms on August 25, 2006, as well as in
September and October of 2006.  Def. Ex. CC.

Ms. Meyer submitted several "absence from work" requests that were signed after the dates to which they applied. Pl. Ex. P-40. Laura Bansemer testified that these forms do not signify whether the absence they acknowledge was excused or unexcused. Def. Ex. R at 33. On October 27, 2006, Ms. Meyer submitted a letter of resignation to NutriSystem. That letter states that Meyer was "interested in knowing if [she] qualif[ied] for COBRA" because she had "medical problems that need immediate attention." Pl. Ex. P-39. The final Employee Action Notice in Catherine Meyer's employee file states that she resigned because "she could not return to work after FMLA." Def. Ex. BB.

The plaintiff states that Ms. Meyer once left work without permission following a hostile exchange with a client. Pl. Ex. F. At 201. She has stated that Meyer "got up and walked off the job, but she came back the next day and she had her job still." Id. at 201:14-16. She states that she was present at the time of this incident and that no supervisors were aware of Meyer's departure. Id. at 205:21-206:2.

### 2. Patricia Cahill

The plaintiff's second comparator is Patricia Cahill. Ms. Cahill is a Caucasian who was hired in October of 2005 by the defendant as a weight-loss counselor. She was initially supervised by Ms. Bansemer and later, beginning November 13,

11

2006, by Ms. Saile.  After April of 2007, she was supervised by
two other individuals, Darcie Jester and Mary Reed.  Ms. Cahill's
employment was terminated in January of 2008.  Ms. Cahill's
employee file states that she was fired for "violations of
company policy."  Def. Ex. DD.

The plaintiff states that Cahill was absent or late to
work as a result of car trouble, but she does not remember the
dates on which these absences occurred.  Pl. Ex. F at 206:11-20.
The plaintiff stated that Cahill "was out for a while."  Id. at
206:15-16.  She states that she communicated with Cahill
regarding her absences and that Cahill told her that she would
receive "leave."  Id. at 206:18-20.

The record relating to both Ms. Meyer and Ms. Cahill is
thin.  The plaintiff never deposed either of these two women.
The record presents no evidence, for example, of the nature of
Ms. Meyer's illness.  Nor has the plaintiff contributed any
documentary evidence to the record regarding Patricia Cahill.
During the plaintiff's depositions of several NutriSystem
employees, Patricia Cahill's came up only in passing and then
only in the context of a list of employees who, along with the
plaintiff, were believed to have four or more unscheduled
absences.  Pl. Ex. A at 81:7-18.

II.  <u>Analysis</u>

The plaintiff brings four counts against the defendant. The first is a claim of race discrimination brought under Title VII.  The second is a violation of the Pennsylvania Human Rights Act, also based on racial discrimination.  The third count is a wrongful termination claim based on the breach of an implied contract and, alternatively, on the violation of Pennsylvania public policy.  Finally, the fourth count alleges a violation of the Family Medical Leave Act.

On a motion for summary judgment, a court must view the evidence and draw reasonable inferences from that evidence in the light most favorable to the party opposing summary judgment. <u>See, e.g.</u>, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  Summary judgment is proper if the pleadings and other evidence on the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56©.


A.  <u>Counts One and Two: Racial Discrimination</u>

The plaintiff's counts based on violations of Title VII and the Pennsylvania Human Rights Act are governed by the same analysis.  <u>Gomez v. Allegheny Health Servs., Inc.</u>, 71 F.3d 1079, 1083-84 (3d Cir.1995).  That analysis is laid out in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973).  The plaintiff must first

13

establish a prima facie case of discrimination.  A plaintiff can establish a prima facie case of race discrimination by demonstrating that:  1) she is a member of a protected class; 2) she was subject to an adverse employment action; and 3) similarly situated members of other racial classes were treated more favorably or that other circumstances exist that give rise to an inference of unlawful discrimination.  Jones v. School Dist. of Phila., 198 F.3d 403, 410-12 (3d Cir. 1999).

If the plaintiff can establish a prima facie case, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. If the defendant can do so, then the burden shifts back to the plaintiff to show that the defendant's articulated reason is actually a pretext for discrimination.  Id. at 410.  To defeat summary judgment, the plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either 1) disbelieve the employer's articulated legitimate reasons; or 2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  Fuentes "places a difficult burden on the plaintiff."  Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005).

14

The parties do not dispute that the plaintiff has made out the first two elements of a prima facie case of race discrimination.  The plaintiff is a member of a protected class and she was subject to an adverse employment action when NutriSystem terminated her employment.  The defendant disputes that the plaintiff has developed evidence that similarly situated members of other classes were treated more favorably than she, and that the plaintiff has developed evidence that NutriSystem's proffered non-discriminatory basis for termination is pretextual.

### 1.  The Plaintiff's Prima Facie Case

The analysis of whether someone is similarly situated to the plaintiff "requires the court to undertake a fact-intensive inquiry on a case-by-case basis rather than in a mechanistic and inflexible manner."  Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 305 (3d Cir. 2004).  In addition to job function and seniority level, the Court must examine "other factors relevant to the particular workplace."  Id.

Catherine Meyer is the first of the plaintiff's two comparators.  Meyer and the plaintiff held the same position at NutriSystem and worked within the same department.  The defendant places emphasis on the point that Ms. Meyer and the plaintiff did not share the same immediate supervisor.  Def. Br. at 20.  The defendant has argued that the difference between supervisors'

levels of tolerance for violations of company policy can render two employees' situations incomparable for purposes of establishing a prima facie case of discrimination.  Oral Arg., April 15, 2009, at 14:7-14.  The defendant also asserts that the record of Meyer's absences reflects a situation incomparable to that of the plaintiff:  Meyer suffered a prolonged illness throughout which she remained in contact with NutriSystem by filing leave request forms whereas the plaintiff missed eight full days of work on account of a cold.

The parties have presented evidence demonstrating that the decision to terminate the plaintiff was not made by the plaintiff's immediate supervisor alone.  The plaintiff's letter of termination dated January 24, 2007, and signed by Nancy Adams, who was NutriSystem's senior human resource generalist, states that the defendant terminated the plaintiff "due to no call/no show 4 times in the month of January."  Def. Ex. Z.  A chain of emails also demonstrates that NutriSystem's human resources department, and not only the plaintiff's immediate supervisor, involved itself in the decision to terminate the plaintiff's employment.  Def. Exs U, X; Pl. Exs P-17-20.

In this respect, Ms. Meyer was similarly situated to the plaintiff.  Both the plaintiff and Ms. Meyer were weight loss counselors employed by NutriSystem.  Their tenures at the company overlapped and they were subject to identical company policies at

16

the time that Ms. Meyer allegedly received more favorable treatment than the plaintiff.  The defendant's human resources department was aware of the absences of both women.  The plaintiff has provided evidence that it was the defendant's human resources department that drove the decision to terminate an employee for violations of the company's absenteeism policy.

Although the plaintiff has contributed to the record no documentary evidence relating to Ms. Cahill's employment with NutriSystem, the evidence presented by the defendant establishes that she was a Caucasian who was hired in October of 2005 by the defendant as a weight-loss counselor.  In those respects, she too was similarly situated to the plaintiff.  Ms. Cahill's employment was terminated in January of 2008 for "violations of company policy."  The employee action notice memorializing Cahill's termination is signed by both her immediate supervisor, Mary Reed, and by Nancy Adams as the representative of the defendant's human resources department. Def. Ex. DD.  Like Ms. Meyer, Ms. Cahill held the same position as the plaintiff, was supervised by the same people for purposes of the relevant actions, and was also absent from work on certain days.

Despite these similarities, the Court does not find that the plaintiff has presented evidence of more favorable treatment of similarly situated, employees belonging to other racial classes.  As to Ms. Meyer, the record does not reflect

that she failed to notify her employers of her absences throughout her tenure at NutriSystem.  The record contains evidence that, during her prolonged absences, Meyer submitted several requests for FMLA leave prior to her absences.  Def. Ex. CC.  Over the course of the three days that Meyer's requests do not coincide with the dates of her absences, the plaintiff presents no evidence demonstrating that she failed to notify NutriSystem.  The plaintiff, on the other hand, concedes that she failed to call NutriSystem on at least two days during her absences.  Moreover, the plaintiff suffered from a cold whereas Meyer suffered from a condition serious enough to justify FMLA leave.[1]

The evidence relating to the alleged incident during which Meyer left her desk without permission is also insufficient to establish her as a comparator.  The plaintiff's provides no basis for her purported knowledge as to whether Meyer informed her supervisors of her departure.  <u>See</u>, Pl. Ex. F at 205:13-21. Nor does the plaintiff provide specifics as to the amount of time missed or whether Meyer was otherwise chastised for her alleged behavior.  For these reasons, the evidence relating to Catherine Meyer does not create a question as to her comparability because

_____

[1]As discussed below, the record does not support the plaintiff's FMLA claim because there is no evidence that she suffered from a "serious health condition."  <u>Infra</u>, Part II(c).

18

there is no evidence of a similar pattern of supposed policy violations.

The evidence as to Patricia Cahill is similarly insufficient to establish that woman as a comparator for purposes of the plaintiff's prima facie case.  Cahill was, in fact, terminated for "violations of company policy" on January 14, 2008.  Def. Ex. DD.  The plaintiff provides no evidence as to the dates of Cahill's alleged infractions, nor does she provide evidence that would suggest a basis of knowledge concerning whether or not Cahill called NutriSystem to inform them of her absences.  The Court finds no evidence, therefore, that Cahill was either similarly situated or treated more favorably than the plaintiff.

The plaintiff has failed to provide evidence of similarly situated employees belonging to a different racial group who received more favorable treatment than the plaintiff. For this reason, the plaintiff fails to present a prima facie case of racial discrimination and judgment will be entered in favor of the defendant on counts one and two.

2.   The Defendant's Proffered Basis for Termination

Even had the plaintiff provided the Court with sufficient evidence to state her prima facie case, the defendant offers a legitimate basis for the plaintiff's termination:

19

repeated violations of the defendant's "no call/no show" policy. The defendant states that it requires its employees to call the company's 800-number to report that they will be absent.  The defendant also maintains that employees must call their immediate supervisors when they will be absent.  The plaintiff attempts to cast these claims as pretextual by arguing that the defendant's policy does not require an employee to call both the 800-number and their immediate supervisor, that the plaintiff did call the defendant to report her absences, that the plaintiff's comparators failed to call in sick, and that the plaintiff had a policy of allowing a person to bring a doctor's note as an excuse after missing work.

        In order to surmount the defendant's proffer of a legitimate basis for termination

> the plaintiff must point to some evidence, direct or
> circumstantial, from which a factfinder could
> reasonably either (1) disbelieve the employer's
> articulated legitimate reasons; or (2) believe that an
> invidious discriminatory reason was more likely than
> not a motivating or determinative cause of the
> employer's action. . . .
>
> [T]o avoid summary judgment, the plaintiff's evidence
> rebutting the employer's proffered legitimate reasons
> must allow a factfinder reasonably to infer that each
> of the employer's proffered non-discriminatory reasons
> . . . was either a post hoc fabrication or otherwise
> did not actually motivate the employment action (that
> is, the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

The defendant argues that Henderson was fired because of her repeated violations of its "no call/no show" policy.  This policy was stated in the two employee handbooks that the plaintiff received during her time at NutriSystem.  The first handbook provided that:

> an employee who will be absent must contact his/her supervisor prior to their scheduled starting time and give the reason for the unscheduled absence and the expected date of return.  Failure to follow this procedure may result in disciplinary action, up to and including termination.

Def. Ex. K at NS150.  The second handbook stated that it is the employee's "responsibility to know the phone number of your immediate manager" and that "it is essential to notify your manager" when sick or late for work.  Def. Ex. M at 48.

The defendant argues that the plaintiff violated the no call/no show policy on nine days in January of 2007.  Although the defendant acknowledges that the plaintiff placed calls to the company's 800-number on certain of those days, they argue that she left no messages with either the answering service or her supervisors.  The plaintiff admits that she did not place calls to Jessica Saile, her immediate supervisor, but states that she called Laura Bansemer or the company's 800-number.  Pl. Ex. F at 99:7-22.

The dates in question are January 7, 8, 14, 17, 18, 19, 21, 22 and 24 of 2007.  The plaintiff has provided evidence demonstrating that her absences from work on January 7 and 8 were

21

noted by her supervisor prior to those dates.  This document is an "absence from work request" form signed on January 5, 2007, by the plaintiff's immediate supervisor Jessica Saile.  Pl. Ex. P-26.

The plaintiff called NutriSystem's 800-number at 12:19 a.m. on January 8, 2007, although the defendant's call log does not contain a record of that call.  Compare Pl. Ex. P-33 with Def. Ex. S.  A note on the defendant's call record states that the plaintiff's sister called again on January 8 at 4:30 p.m. to report that the plaintiff would not be at work that day, Def. Ex. S, although the plaintiff has stated that she called on January 8 at that time, not her sister.  Pl. Ex. F at 132.

The plaintiff attended work from January 10 to 12 without incident.  On January 14, 2007, the plaintiff arrived thirty minutes late to her shift.  Def. Ex. U.  The plaintiff does not refute that she was late on this day or offer evidence that she alerted her supervisors to her need to arrive late.

The plaintiff was at work again on January 15, had a scheduled day off on January 16, and was absent again on January 17, 2007.  At her deposition on December 15, 2008, the plaintiff stated that she called the defendant several times in an attempt to get "family leave" and sick time.  Pl. Ex. F at 180-81.  She states that she probably called in the morning, although she also said that she does not remember the exact times of her calls.

The plaintiff did not, at that deposition, recall from which phone she placed those calls.  Id. at 181:24.  Later in that same deposition, the plaintiff stated that her sister placed one or two calls to NutriSystem on her behalf during January of 2007. She believed those calls were made around January 8, 2007, although she was uncertain of the exact dates.  Id. at 198:12-15. The plaintiff stated that she did not recall whether those calls were made in her presence.  Id. at 199:6.

The plaintiff stated that she called on January 17, 2007, in an effort to "get family leave."  Pl. Ex. F at 180:21. In an affidavit prepared after the defendant's motion for summary judgment was filed, the plaintiff states both that she called on January 17, 2007, and that her sister called on that date.  Id., ¶¶ 11, 16.  Unlike her deposition testimony, the plaintiff's affidavit states that she recalled her sister's call to NutriSystem on January 17, that she was present when the call was placed, and that she has a recollection of the content of the message her sister left with the defendant.  Pl. Ex. G, ¶ 16.

The plaintiff's cell phone record lists only one call made by from that number to NutriSystem on January 17, 2007.  Pl. Ex. P-33.  The plaintiff stated at her deposition that she did not recall which phone her sister used to call NutriSystem on any particular day.  Pl. Ex. F.

23

The plaintiff was absent from work on January 18, 19, 21, 22 and 24.  The plaintiff has stated that she does not recall making any specific calls to NutriSystem on January 18, 19, 21 or 24.  Pl. Ex. F at 151-154, 183-185.  Her cell phone record reflects two calls placed to NutriSystem on January 21, 2007, but no other calls over the course of these dates.  The defendant has provided an email composed by the plaintiff's immediate supervisor, Jessica Saile, stating that the plaintiff did not call NutriSystem on January 18, 19 or 24.  The email states that the plaintiff did not come in for work on January 21 or 22, but does not state that the plaintiff failed to call.  Def. Ex. U. The plaintiff's affidavit states that on January 21, 2007, she "placed at least two phone calls to NutriSystem advising them that [she] was still not able to return to work because of [her] illness and that [she] was scheduled to see [her] doctor the next day."  Pl. Ex. G, ¶ 18.

The plaintiff does not dispute that she was late to or absent from work on nine days out of thirteen in January of 2007. Although she has pointed to evidence that she called NutriSystem on certain of those days, she does not dispute that she failed to call her immediate supervisor, Jessica Saile.  Nor does she claim to have called NutriSystem at all on either January 14 or 18. The only evidence of calls placed on January 19, 22 or 24 is the

plaintiff's affidavit composed well after her receipt of the defendant's motion to dismiss.

The uncontested evidence of the defendant's prior warning to the plaintiff regarding a similar pattern of absences and policy violations further supports the defendant's legitimate basis for termination.  Although the plaintiff disputes the factual basis for one aspect of the warning she received on November 15, 2006, and contends that the warning should have been given verbally, she does not contest the overall basis for the defendant's disciplinary warning or present evidence suggesting that the earlier warning was unfounded.  See, Def. Ex. T; Pl. Ex. F at 109:2-110:5; Pl. Ex. G, ¶ 9.  The evidence of this earlier infraction, the plaintiff's absences in January of 2007, and the lack of evidence that would cast these events as pretextual does not provide a record establishing that the defendant's proffered basis for termination was "either a post hoc fabrication or otherwise did not actually motivate the employment action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d 1994).

The record reflects eight full days of absences without a single conversation between the plaintiff and her supervisors, coupled with a lack of evidence of calls being placed to the defendant on certain days during that extended absence.  Although the plaintiff's briefs have asserted that her land line would not provide records of local calls, she has presented no evidence to

support that assertion.  See, Pl. Ex. G.  In any case, the plaintiff's recently signed affidavit, which was unavailable to the defendant during the period for discovery and which presents assertions frequently at odds with her deposition testimony, is not sufficient to overcome such a legitimate basis for termination.

The plaintiff also attempts to refute the legitimacy of the defendant's basis for her termination by arguing that Catherine Meyer's experience with the defendant demonstrates that the defendant had no policy requiring an absent employee to call NutriSystem ahead of her absences.  Rather, the plaintiff attempts to use Ms. Meyer as an example of the defendant permitting its employees to take extended leaves of absence without prior approval and without the employee calling the defendant to inform it of the absence.

The record reflects that Ms. Meyer took two leaves of absence while working for the defendant.  The first was from July 1, 2005, to August 22, 2005.  For this period, Ms. Meyer filled out an FMLA request for leave on June 27, 2005.  Her second leave of absence was from August 22, 2006, to October 13, 2006.  Ms. Meyer filled out FMLA request forms on August 25, 2006, as well as in September and October of 2006.  Def. Ex. CC.  The plaintiff argues that Ms. Meyer submitted several "absence from work" requests that were signed after the dates to which they applied.

Pl. Ex. P-40.  Indeed, Ms. Meyer did fill out these forms
following her absences, although Laura Bansemer testified that
these forms do not signify whether the absence they acknowledge
is excused or unexcused.  Def. Ex. R at 33.  Finally, the
plaintiff states that Ms. Meyer once left work without permission
following a hostile exchange with a client.  Pl. Ex. F. At 201.

The record pertaining to Ms. Meyer does not suffice to
carry the plaintiff's burden of establishing pretext.  Meyer's
long absences from work were paired with formal requests for
family medical leave, which are dated prior to those absences.
The record reflects only a three-day gap during which Meyer's
FMLA request forms did not cover her absences.  These three days
in the midst of a prolonged illness, which was reported to
NutriSystem and was serious enough to qualify for FMLA leave, do
not present evidence sufficient to overcome the defendant's
legitimate basis for the plaintiff's termination.  The plaintiff
presents no evidence demonstrating that Meyer failed to call her
immediate supervisor on those days or otherwise failed to inform
NutriSystem that she would be absent.

Nor does the plaintiff's allegations regarding Meyer's
abruptly walking away from her desk suffice to establish pretext.
The plaintiff could not state whether Meyer made human resources
aware of her departure that day.  Nor does the allegation of Ms.
Meyer's action, devoid of specifics as to the amount of time

missed or any discussions with supervisors, reasonably compare to the plaintiff's repeated absences from work.   The plaintiff did state that she "kn[ew] for certain" that Meyer did not inform human resources of her absence on that day, but simultaneously maintains that she was in the same room that Meyer left at the time of the incident.  Pl. Ex. F at 205:13-21.  This does not present evidence that Meyer's absence was unknown in advance to the same decision makers who terminated the plaintiff or that Meyer failed to obtain permission to leave.   The evidence relating to Catherine Meyer does not "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" Fuentes, 32 F.3d at 765 (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir.1992)).

Finally, the plaintiff has claimed that Patricia Cahill missed some amount of work as a result of car troubles.  Pl. Ex. F at 206.  The plaintiff states that Cahill was absent or late to work as a result of car trouble, but she does not remember the dates on which these absences occurred.  Id. at 206:11-20.  In fact, she provides no evidence relating to any circumstance surrounding those absences aside from her statement at her deposition that Cahill did not call both her supervisor and the

800-number when she came in late for work.  Pl. Ex. F at 207:4-
10.  The plaintiff's allegation regarding Cahill does not present
sufficient evidence to suggest that the defendant's proffered
reason for terminating the plaintiff is a pretext for
discriminatory treatment.

  For these reasons, the Court holds that the plaintiff
has presented insufficient evidence to surmount the defendant's
legitimate reason for terminating the plaintiff.  Judgment will
be entered in favor of the defendant on counts one and two.


  B.  <u>Count Three: Breach of an Implied Contract and
   Violation of Public Policy</u>

  The plaintiff's third count states that her termination
was a "violation of Defendant's sick benefit policies, attendance
policies, and disciplinary policies [and was therefore] a breach
of an implied contract and a violation of public policy in the
Commonwealth of Pennsylvania."  Compl., ¶ 25.  The defendant has
argued that this count is solely a claim for wrongful termination
as a violation of public policy, which it argues is barred by
Pennsylvania law.  The plaintiff responds that the count contains
two bases of liability: wrongful termination as a violation of
public policy and a breach of implied contract.  The Court agrees
that the count asserts both theories of liability, but will enter
judgment for the defendant under both theories.

1.  Breach of Implied Contract

The plaintiff argues that she had accrued sick time with pay that would have covered the dates of her absences from January 17 through 26, 2007, and that she had a right to enforce her sick leave under the defendant's employee benefits program. She also claims that NutriSystem "provided employment benefits to its employees [including] sick leave with sick pay benefits, medical leave of absence and acceptable procedures for employees to call out of work."  Opp'n at 25-26.

Pennsylvania courts have explained the necessary elements of a claim based on an implied contract.

> A contract implied in fact can be found by looking to the surrounding facts of the parties' dealings.  Offer and acceptance need not be identifiable and the moment of formation need not be pinpointed.  Restatement (Second) of Contracts § 22(2) (1981).  "Implied contracts . . . arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract."

Ingrassia Const. Co., Inc. v. Walsh, 486 A.2d 478, 483 (Pa. Super. Ct. 1984) (quoting Pollock Industries, Inc. v. General Steel Castings Corp., 201 A.2d 606, 610 (Pa. Super. Ct. 1964)); see also, Rissi v. Cappella, 918 A.2d 131(Pa. Super. Ct. 2007).

The plaintiff does not actually identify the circumstances under which an implied contract was created.  She does not allege that she and NutriSystem ever reached a common understanding that she was entitled to the benefits she now

claims.  Documents in evidence outlining those benefits in the form of the Employee Handbook demonstrate that no such common understanding existed.  The first of these handbooks states: "Employees are employed at-will.  This means that an employee's employment and compensation can be terminated with or without cause and with or without notice at any time at the option of either the Company or the employee.  NutriSystem, Inc. does not enter into employment contracts with any of its employees." Def.'s Ex. K at NS0131.  The second handbook states: "Please understand that this Handbook does not create any rights . . . . The policies, benefits and procedures contained herein may be changed, revised, or amended at any time, in an individual case or generally, by Nutri-System, Inc. . . ."  Def.'s Ex. M at 2.

        The defendant's handbooks and the plaintiff's signatures acknowledging receipt of those handbooks undermines any argument that the facts of this case imply a "common understanding . . . to contract" so as to provide for contractual benefits like those claimed by the plaintiff.  Although the plaintiff has provided evidence that the defendant furnished certain benefits to its employees, she has not offered any evidence or argument that the parties reached an agreement or had the intention to contract with respect to those benefits.

2.   <u>Common Law Wrongful Termination</u>

The plaintiff also characterizes the defendant's actions as a wrongful termination in violation of a state public policy relating to an employee's right to take medical leaves of absence.  Opp'n at 27.  She claims that the defendant denied her requested medical leave from January 17 to January 26, 2007, and fired her in retaliation for making those requests.

In support of her argument that termination based on a request for sick leave violates Pennsylvania public policy, the plaintiff cites to <u>Shick v. Shirey</u>, 716 A.2d 1231 (Pa. 1998). <u>Shick</u> held that a cause of action exists under Pennsylvania law for wrongful discharge of an employee who files a claim for workers' compensation benefits.  <u>Id.</u>  The plaintiff argues that, similarly, she is "entitled to pursue a wrongful termination claim based on her right to exercise her rights under the state's law protecting employees' medical leave of absence."  Opp'n at 28.

In <u>Shick</u>, the Pennsylvania Supreme Court held that a court could determine what counts as important public policy for the purpose of stating a wrongful termination claim.  The Supreme Court stated that courts may ascertain "clear mandates" of public policy "by reference to the laws and legal precedents and not from general considerations of supposed public interest."  With respect to workers' compensation, the Supreme Court discussed the

"historical quid pro quo" underlying the state system of workers'
compensation as a factor that demonstrated a sufficiently clear
mandate of public policy to warrant protection through this
common law claim.  Id. 716 A.2d at 1237.  "The historical balance
[between employers' limited liability and workers' limited
redress] would be disrupted if the employer could terminate an
employee for filing a workers' compensation claim."  Id.

        The plaintiff is not making a claim related to workers'
compensation.  The plaintiff references a "right under the
state's law protecting employees' medical leave of absence," but
does not provide references to any state laws, regulations or
opinions of the Pennsylvania courts that would establish a "clear
mandate" of public policy sufficient to override the at-will
employment relationship.

        Even if the Court were to hold that Pennsylvania
recognizes a public policy that would protect an employee's right
to sick leave or other benefits, the Court would still grant
judgment to the defendant.  Paragraph 25 of the plaintiff's
complaint states that she was fired in violation of the
defendant's sick benefit policy, but the complaint does not
allege any facts relating to retaliation on the basis of a
request for sick leave.  The complaint and the plaintiff's
opposition to summary judgment are overwhelmingly focused on
racial discrimination.  Nor does the record contain evidence that

33

would demonstrate that the plaintiff's termination was based on retaliation for making a request for sick-time benefits.  As discussed above, the defendant has offered a legitimate basis for the plaintiff's termination, which the plaintiff has failed to refute.

C.   Count Four: Denial of Rights Under the Family Medical Leave Act

The plaintiff's fourth count claims that she was illegally denied FMLA leave.  She states that the defendant ignored her request for such leave and failed to send her an FMLA leave request form.  Pl. Opp'n at 29.  The plaintiff has failed to allege that she suffered from any condition cognizable under the FMLA and therefore the Court will enter judgment in favor of the defendant on this claim.

The FMLA provides leave to employees suffering from "serious health conditions."  29 U.S.C. 2612(a)(1)(D).  A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  Federal regulations further define the requirements for a showing of a serious health condition involving continuing treatment by a health care provider.

(a) Incapacity and treatment. A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

(3) The requirement in paragraphs (a)(1) and (2) of this section for treatment by a health care provider means an in-person visit to a health care provider. The first (or only) in-person treatment visit must take place within seven days of the first day of incapacity.

(4) Whether additional treatment visits or a regimen of continuing treatment is necessary within the 30-day period shall be determined by the health care provider.

(5) The term "extenuating circumstances" in paragraph (a)(1) of this section means circumstances beyond the employee's control that prevent the follow-up visit from occurring as planned by the health care provider. Whether a given set of circumstances are extenuating depends on the facts. For example, extenuating circumstances exist if a health care provider determines that a second in-person visit is needed within the 30-day period, but the health care provider does not have any available appointments during that time period.

29 C.F.R. 825.115.

In this case, the plaintiff was first reported ill on January 7th, but she did not see a doctor until January 22nd, far more than seven days after the first day of her claimed incapacity as required under 29 C.F.R. § 825.115(a)(3).  See Pl. Ex. F at 123:10-11–142:4-18.  Moreover, she never received treatment by a health care provider "which result[ed] in a regimen of continuing treatment."  29 C.F.R. § 825.115(a)(2).  In fact, the plaintiff stated at her deposition that her doctor's office told her that "if [she] had any more problems, just come back in to see them, but [that she] didn't need to go back in to see them."  Pl.'s Ex. F at 188:9-10.  The plaintiff went to the doctor on January 22nd, got a recommendation to take certain over the counter drugs, and returned to her doctor on January 26th to get a note meant to excuse her absences.  The note she received said that she was "totally incapacitated," but the plaintiff believes that her doctor's receptionist, rather than her doctor, signed this note.  Pl.'s Ex. F at 193:14-20.

This record does not contain evidence demonstrating that the plaintiff had any rights under the FMLA.  The plaintiff, therefore, does not provide evidence of an injury caused by the defendant's alleged denial of leave under that statute.  The Court will grant judgment to the defendant on count four.

For these reasons, the Court will grant the defendant's motion for summary judgment in its entirety.  Judgment will be

entered in favor of the defendant and against the plaintiff.  An
appropriate order will be filed separately.